Elan S. Mizrahi (No. 017388)
E-mail: esm@jhc-law.com
Craig J. Bolton (No. 10783)
E-mail: cjb@jhc-law.com
**JENNINGS, HAUG & CUNNINGHAM, LLP**
2800 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-1049
Telephone: 602-234-7800
Facsimile: 602-277-5595

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Designer Skin, LLC, an Arizona limited liability company; Splash Tanning Products, LLC, an Arizona limited liability company; Boutique Tanning Products, LLC, an Arizona limited liability company, | Case No.: CV05-3699-PHX-JAT<br><br>**PLAINTIFFS'/ COUNTERDEFENDANTS' RESPONSE TO MOTION FOR JUDGMENT BY DEFENDANTS/ COUNTERCLAIMANT** |
| Plaintiffs, | |
| vs. | |
| S & L Vitamins, Inc. d/b/a Body Source d/b/a thesupplenet.com, a New York corporation; and Larry Sagarin, an unmarried individual, | |
| Defendants. | |
| S & L Vitamins, Inc. d/b/a Body Source d/b/a thesupplenet.com, a New York corporation, | |
| Counterclaimant, | |
| vs. | |
| Designer Skin, LLC, an Arizona limited liability company; Splash Tanning Products, LLC, an Arizona limited liability company; Boutique Tanning Products, LLC, an Arizona limited liability company, | |
| Counterdefendants. | |

Plaintiffs/Counterdefendants Designer Skin, LLC, Splash Tanning Products, LLC and Boutique Tanning Products, LLC (collectively hereinafter "Designer Skin") hereby respond to the Defendants/Counterclaimant's ("S&L") *Motion For Judgment.* This Response is supported by the following Memorandum of Points and Authorities, a separate *Statement of Controverting and Supplemental Facts* ("CSOF") and by the entire record herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This lawsuit arises from S&L's violations of Designer Skin's intellectual property rights and interference with Designer Skin's contractual relationships with its distribution network. Designer Skin's separately filed *Motion For Partial Summary Judgment* ("MPSJ") and *Statement of Facts* ("SOF") explains the background of this dispute, and, for reasons of economy, that explanation is not repeated here.

S&L's *Motion For Judgment* argues two positions: (1) that Designer Skin has not established a *prima fascie* case for its claims; and (2) if S&L is guilty of the complained of conduct, such conduct is excused.

S&L's first position is addressed in Designer Skin's MPSJ. There, Designer Skin establishes each claim's elements and explains why Designer Skin is entitled to judgment as a matter of law.

S&L's second position is that its patently illegal conduct is excused for the following reasons:

1. That S&L buys and sells Designer Skin products entirely in a secondary market thus excusing S&L's use of Designer Skin's trademarks (the "First Sale Doctrine");

2. That S&L does not directly purchase Designer Skin's products from distributors (the "lack of privity" argument); and

2

  3. That S&L uses Designer Skin's trademarks solely to identify its product to consumers, thus excusing S&L's use of those trademarks (the "Nominative Use Doctrine Argument").[1]

S&L is wrong because it misapplies the First Sale and Nominal Use Doctrines; it tortuously acquires Product through agents; and Designer Skin's demand to S&L was and remains valid. Additionally, S&L's factual support for these defenses is based solely on a conclusory and often incompetent[2] Affirmation of Larry Sagarin ("Sagarin") (S&L's principal). S&L's *Motion for Judgment* refers to no other part of the record[3]. S&L's *Motion for Judgment* should be denied on the basis that it relies solely upon Sagarin's sweeping conclusory statements, not on allegations of particular facts. Additionally, S&L's conclusory generalizations are either false or incomplete, and its legal analysis misapplies the above identified legal doctrines.

Lastly, S&L argues extensively from blog comments on policy issues. [See, S&L's *Motion for Judgment* at p. 4-5 n.2 and pp. 15-16.]. Such citations are not authoritative <u>or</u> persuasive since they are not based on either referenced and scholarly sources or recognized authoritative treatises, but only on "one man's self-serving opinion as voiced on the internet." This Court should accord these arguments the weight that they are legally entitled to -- none.

## II. <u>ANALYSIS OF S&L's "FIRST SALE" DEFENSE</u>

As S&L notes, the "First Sale Doctrine" is an affirmative defense in trademark law which exempts from a trademark infringement action or an action

---

[1] As this Court has previously ruled, Items 1 and 3 are affirmative defense on which Defendants bear the burden of proof. Designer Skin, LLC v. S&L Vitamins, Inc., 2007 WL 841471 *1 (D.Ariz.)(slip copy), see also Ultimate Creations, Inc. v. THQ Inc, 2008 WL 215827 *4 (D.Ariz.)(slip copy)(defendant has the burden of demonstrating that the term at issue was used "descriptively, not as a mark, fairly and in good faith.")

[2] See Designer Skin's accompanying CSOF for a specification of and objection to those respects in which Sagarin is incompetent to testify to certain matters set forth in his Affirmation.

[3] In fact, as is noted in Designer Skin's SOF, Paragraphs 21-26 of Defendants' SOF refer to no part of the record, including Sagarin's Affirmation; hence, it should not be considered by this Court. "Conclusory allegations are an insufficient basis upon which to grant a motion for summary judgment. "*The ARC of Washington State, Inc. v. Braddock*, 129 Fed.Appx. 348, 351 (9th Cir. 2005), <u>citing</u> *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990).

1  for unfair competition the use of a trademarked product name in a secondary
2  market solely when the trademarked name is used solely to identify the product
3  being offered for sale.  This Doctrine is wholly inapplicable here, as Designer Skin
4  does not claim that S&L's use of Designer Skin's name and product names are per
5  se improper.  Rather, the legal issue is that S&L uses Designer Skin's trademarks to
6  deliberately cause initial interest confusion.

7  The facts herein are easily distinguishable from *Sebastian Intl' Inc. v Longs*
8  *Drug Stores Corp.,* 53 F.3d 1073 (9th Cir. 1995).  In *Sebastian* the manufacturer
9  argued that the "first sale" doctrine was not applicable to articles sold under a
10 "collective mark" such as those identifying membership in a "…lodge, political
11 party, club or other collective [membership] organization." 53 F.3d at 1075.  The
12 Court rejected that argument and it has no applicability here.

13 Merely selling under a mark is not, in itself an indication of affiliation.
14 Deliberately using a mark to divert traffic to one's place of business, as opposed to
15 "approved" outlets is, however, an attempt to appropriate the good will connected
16 with the mark and is actionable. See *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228
17 (10th Cir. 2006).

18 **III.   ANALYSIS OF S&L's "LACK OF PRIVITY" DEFENSE**

19 S&L's only argument to challenge Designer Skin's claim of interference with
20 the contractual relationship is that S&L does not directly buy products from
21 Designer Skin's distributors.  Thus, S&L argues, Designer Skin's contractual
22 restrictions upon its distributors have no relevance to S&L's purchases due to a
23 lack of privity. [S&L's *Motion for Judgment* at pp. 11 ff.].

24 S&L's argument is misguided.  Designer Skin does not seek to restrict sale of
25 its product beyond the limits of its distribution network.  As noted above, Designer
26 Skin's distribution network is comprised of authorized distributors and sub-

4

distributors who have contractually obligated themselves to sell only to approved salons. A salon is only approved if it agrees to sell Designer Skin's products exclusively to end users and offers on-site tanning and instruction. If John Smith [an end user] wants to purchase a Designer Skin product at retail and then resell it to Sally James, no legal issue is created and none has ever been alleged by Designer Skin.

The only issue with respect to purchases and sales raised herein is whether S&L--by *obtaining product*, not by selling it—does so in such a way as to knowing and unlawfully interfere with Designer Skin's distribution network, thus inducing breaches in contractual relationships within Designer Skin's distribution network. Purchase from "a [secondary] market" is different from purchase from a contractually bound group of distributors.

Sagarin and S&L's principal have testified extensively regarding these matters in the *Australian Gold* lawsuit.[4] Sagarin's testimony is as follows: In late 2003 S&L began selling indoor tanning lotion sales after accepting product boxes from a salon owned by his long time friend, Danny Sheehan ("Sheehan"), in "barter" for vitamin supplements sold by S&L. The profitability of the transaction for S&L sparked a genesis of regular, voluminous transactions that have continued to the present day. Indeed, as early as the end of 2003 or the beginning of 2004 S&L was buying products from four different "sources," and the volume of purchases from his largest "source" [again Sheehan] was in the range of 400-800 bottles of product once or twice a week. S&L's gross sales rose from approximately $900,000 in 2003 to in excess of $1,400,000 in 2004, the same period in which S&L started

---

[4] Extracts of Sagarin's Deposition testimony are attached as Exhibit 3 to Plaintiff's SOF, herein, but as some of the references made above are not included in those extracts, further extracts are attached to the CSOF filed herewith. See Paragraphs 20-32 of the Supplemental Facts contained in Designer Skin's CSOF for page references to the following assertions in the testimony of Sagarin and Mercadante.

5

selling indoor tanning lotions[5]. This purchase of otherwise restricted product through a proxy is S&L's *modis operandi*.

Sagarin testified that S&L would order multiple boxes of product from Sheehan by phone [up to 800 bottles in an order] and pick up the order 1-4 days later. Sagarin would drop by Sheehan's business in his truck, and Sheehan would deliver the products he had ordered to him in the original producer's shipment crates and with original invoices from distributors[6]. Sagarin would take the products back to S&L's place of business, inventory the boxes and then pay the distributors' invoice to Sheehan plus a mark-up of 10-20%. Sagarin would return the distributors' invoice to Sheehan along with S&L's check (presumably so that the invoice could not then be produced in subsequent litigation). In order to have some record of what S&L was paying for, however, Sagarin would write the distributors' invoice number(s) on the S&L check by which he paid Sheehan for the product being purchased.

Sheehan was well aware that S&L intended to resell the product that Sheehan supplied to it over the internet. Sagarin and S&L were well aware of the restrictive distribution contracts that characterized Designer Skin's distribution network and the fact that such distributors would never knowingly sell directly to him. Sagarin's procedures with his "other sources" were similar to those procedures that he had with Sheehan, with the exception that orders were sometimes placed by fax rather than phone and payment was on delivery, not after delivery and inventory. There is no question that Sagarin has always known that the Designer Skin product S&L sells is obtained through breaches of contract and

---

[5] With respect to Designer Skin products, in Sagarin's present Affirmation he admits that he and S&L have "on the Internet since 2003,… sold hundreds of thousands of dollars' [sic] worth of these [Designer Skin] products…" [Paragraph 5].
[6] This testimony of course contradicts that Sagarin's present testimony that he does not and never has known the identity of any Designer Skin distributors. As he testified, he regularly saw invoices from these distributors to his various "sources."

6

1  false representations, and that S&L breaches Designer Skin's distributor contracts.
2        S&L is still conducting business using this same pattern of conduct. John
3  Tymann ("Tymann"), the President of one of Designer Skin's Sub-Distributors,
4  Stay Tan North, Inc. ("Stay Tan"), has testified that Yucatan Tanning, the firm
5  originally owned and operated by Sheehan, has recently made numerous orders
6  of Designer Skin and related indoor tanning products from Stay Tan; and that
7  Yucatan had these shipments drop-shipped directly to S&L's place of business on
8  the subterfuge that Yucatan was opening a new salon at that location. Tymann
9  has further testified that he is reliably informed that the new owner of Yucatan is,
10 in fact, no longer in the tanning salon business and that its principal no longer
11 owns any tanning salons.
12       This situation is much like that considered by the Tenth Circuit in its opinion
13 in *Hatfield*, supra. There, the trial court dealt with an internet reseller of indoor
14 tanning products, much like S&L, which raised basically the same defenses that
15 have been raised by S&L herein. Like Designer Skin, the plaintiff tanning lotion
16 manufacturer in *Australian Gold* had undertaken considerable expense to create a
17 distribution network and train those in the network in compatibilities, expected
18 results and correct use of its product (436 F.3d at 1232). The internet seller, aware
19 that it could not legitimately buy the manufacturer's product for internet resale,
20 initially bought product first from a renegade distributor and then from an
21 "anonymous seller" and finally misled legitimate distributors into selling product
22 to the internet reseller by misrepresenting that the internet reseller's principals ran
23 tanning salons (436 F.3d at 1232-33). These facts resulted in a jury award for
24 $500,000.00 against the internet seller for interference with the manufacturer's
25 contractually based distribution network (436 F.3d at 1234). The internet
26 distributor moved for judgment despite the verdict and the trial court denied that

motion. The Tenth Circuit affirmed the trial court. (436 F.3d at 1235)

The only difference between *Hatfield* and the present matter is that in *Hatfield* the internet reseller directly made the misrepresentations to distributors causing them to breach their distribution contracts. (436 F.3d at 1236). S&L alleges that it works through "sources" - like Danny Sheehan and Yucatan Tanning - who are left the job of themselves making misrepresentations to Designer Skin's distributors. This distinction is without merit. Whether S&L acts directly or is a co-conspirator with its proxies--knowing agents of S&L acting on S&L's behalf and at S&L's direction --- it is knowingly inducing contractual breaches through admitted misrepresentations, and is liable for such.

S&L attempted this same "agent" defense, alleging the same fact pattern, in the case of *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F.Supp.2d 188 (E.D.N.Y.,2007). On this issue and on those facts that Court ruled as follows:

> The next issue is …whether S&L intentionally and unjustifiably induced the third parties [the distributors] to breach their contracts with AG. S&L claims that it did not have direct contact with AG's distributors and instead acquired Products from the tanning salons. AG contends this is irrelevant. AG's argument is persuasive. Whether S&L is twice removed from the contractual relationship between AG and third parties is irrelevant. A defendant can still be held liable for its tortious conduct despite its circuitous conduct. *See John Paul Mitchell Sys. v. Pete-N-Larry's, Inc.*, 862 F.Supp. 1020, 1029 (W.D.N.Y.1994) (citing *Benton v. Kennedy-Van Saun Mfg. & Eng. Corp.*, 2 A.D.2d 27, 152 N.Y.S.2d 955, 958 (N.Y.App. Div. 1st Dep't 1956)).

521 F.Supp.2d at 217.

Hence, there is substantial evidence, in Sagarin's own testimony and Tymann's Declaration, that S&L and Sagarin are guilty of tortious interference with Designer Skin's contractual relationships.

To validate the use of proxies, S&L cites to the cases of *John Paul Mitchell Systems v. Quality King Distributors*, 106 F.Supp.2d 462 (S.D.N.Y. 2006) and *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F.Supp. 1237 (D.N.J. 1994). The *John Paul*

8

*Mitchell* decision involved a preliminary injunction, not a summary judgment. The discussion in *John Paul Mitchell* cited by S&L (which occurs on page 476, not 475) in fact <u>rejected</u> the defendant/product diverter's contention that it was not aware of the existence of restrictive contracts between the producer and the distributors from which it diverted product [the same claim made by S&L here]. The Court's rejection was based on the obvious business sophistication of the defendant/product diverter and its conduct, and the representation of the plaintiff manufacturer that it sold only to those distributors who were contractually bound to sell only to authorized salons. S&L's discussion of this case, and carefully edited quotation from the case, implies that the *John Paul Mitchell Court* stands for the opposite proposition.

In the *Matrix* case the essential fact was the plaintiff's allegation that it had contracts with salons that restricted their sale to end users and that the diverter had knowledge of the existence and restrictive terms of these contracts. 870 F.Supp. at 1246. In the present case there are no salon contracts [a fact relied on heavily by S&L], and S&L has admitted that it has not tried to buy directly from Designer Skin's distributors because it knows that they are prohibited to sell to S&L by their restrictive distribution contracts with Designer Skin. The material facts of the *Matrix* case on which the *Matrix* Court based its ruling and this case are thus totally dissimilar.

## IV.    <u>ANALYSIS OF S&L's "NOMINATIVE USE" DEFENSE</u>

S&L's defense based on its purported nominative use of Designer Skin's trademarked name is predicated on S&L's false contention that it does no more than use the name "Designer Skin" and the names of Designer Skin's products to identify the products it is selling. S&L invokes the nominative use doctrine with respect to what are in fact two discrete issues:  (1) whether S&L's use of certain

1  images on S&L's website are legally permissible or violations of Designer Skin's
2  copyrights; and (2) whether S&L's use of Designer Skin's trademarked name and
3  product names in metatags and key word internet searches infringe upon Designer
4  Skin's intellectual property rights.  In S&L's *Motion for Judgment* it waivers back
5  and forth as to which defense to what cause of action it is advancing.  Hence, for
6  clarity, these issues will be considered separately and sequentially.

7       A.    <u>Evidence That S&L Has Violated Designer Skin's Image Copyrights</u>

8       S&L contends that it is confused as to which of Designer Skin's copyrights
9  images it is suppose to have copied and that, in any case, it only utilizes pictures of
10 Designer Skin's product bottles on its website that it has itself commissioned.  The
11 *Affidavit of Mike Shawl*, attached as Exhibit 2 to Plaintiff's SOF should alleviate any
12 confusion suffered by S&L by refuting its claim of image originality. Mike Shawl's
13 ("Shawl") *Affidavit* establishes that:  (1) he is and has been the graphic designer for
14 Designer Skin for the past ten years; (2) he created the images of Designer Skin
15 products on Designer Skin's website; (3) he has examined the images of Designer
16 Skin products on S&L's website and, (4) that with only two exceptions, S&L cut
17 and pasted these images from Designer Skin's website.  Shawl explains that he has
18 determined that the S&L's website images are, without question, the same images
19 he produced, rather than being independently produced images of Designer Skin
20 product bottles.

21     In addition to the foregoing evidence, the Court should note that cutting and
22 pasting of copyrighted images is a pattern of conduct for S&L.  In litigation before
23 the United States District Court for the Central District of California, S&L has
24 admitted to having cut and pasted images from another indoor tanning product
25 manufacture's website unto S&L's website.  [See p. 9 of  Exhibit 5 to Designer
26 Skin's SOF.]

Given that Shawl's sworn testimony regarding S&L's copying of Designer Skin's copyrighted images is explicit and contains specific examples of such copying, while Sagarin's testimony is but a general and conclusive denial of any copying, summary judgment should be awarded in favor of Designer Skin and against S&L on this factual issue and on the underlying associated infringement of image copyright claim.[7]

B. <u>The Nominate Use Doctrine Does Not Permit Infringement of Designer Skin's Trademarks</u>

In addition to its attempted utilization of the nominative use doctrine as a shield against Designer Skin's case for image copyright infringement, S&L contends that the same nominative use doctrine defeats Designer Skin's case for trademark infringement.

The facts underlying this trademark controversy are simple. S&L has trademarked the name "Designer Skin" and all of its product names. [See Exhibit 1 to Plaintiff's SOF in support of Plaintiff's MPSJ and Paragraph 2 of the Supplemental Facts contained in Designer Skin's CSOF ]. S&L admits that it has bid on, purchased, and otherwise implemented the key word "rights" from the Yahoo search vendor, OVERTURE.COM and from the similar Google search vendor, Google Ad Word (Sagarin Transcript at pp. 102-103, 106-07) for the trademarked name "Designer Skin" and a variety of Designer Skin's trademarked product names. S&L has been paying at least $50,000 per year for these "rights." (Sagarin Transcript pp. 104-105) The result is that if a potential customer of Designer Skin products types into the Yahoo or Google search engines the name "Designer Skin," or the names of Designer Skin's products on which S&L has

---

[7] The Court should additionally note that the only evidence that S&L has presented that it has not engaged in more extensive infringement of Designer Skin's copyrighted images is Sagarin's conclusive testimony that S&L's website has never contained more than images of product bottles. As is discussed in Designer Skin's MPSJ (at pp. 13-14), S&L modified its website 124 times from 2003-2006 and has blocked any viewing of the previous versions of its website that otherwise would be available at www.archive.org (the "Internet Archive Wayback Machine").

11

1 purchased key words, S&L's website will be either the top link on the results list or
2 very near the top. This use of Designer Skin's trademarked name and trademarked
3 product names for marketing purposes clearly (1) diverts business from Designer
4 Skin's authorized salon outlets to S&L; (2) implies to potential customers that S&L
5 is affiliated with Designer Skin or, at a minimum, is authorized to distribute
6 Designer Skin products,[8] (3) diverts customers from Designer Skin's website which
7 is intended to market Designer Skin's products and inform customers about the use
8 of these products, and (4) misappropriates the good will associated with Designer
9 Skin's trademarks.

10 Since there are apparently no material factual disputes with respect to what
11 S&L has done and continues to do in purchasing key words and metataging its
12 website, summary judgment in favor of Designer Skin is proper on this issue.

13 S&L claims that its conduct is excused, citing to the decision in *Playboy*
14 *Enterprises, Inc. v. Welles*, 279 F.3d 798 (9th Cir. 2002)[9] and ignoring the later
15 opinions of *Playboy Enterprises, Inc. v. Netscape Communications Corporation*, 354 F.3d
16 1020 (9th Cir. 2004), *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1018
17 (9th Circ. 2004), and *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006),
18 each of which endorse the equation of a third party using a trademarked metatag
19 with trademark infringement.

20 Presuming that *Welles* has not been implicitly overruled by *Netscape*
21 *Communications*, it is easily distinguishable. The principal factual observation on
22 which the *Welles* Court based its holding was that Tuesday Welles had no practical
23 way to identify her "product" other than to use Playboy Enterprise's trademarked

---

[8] S&L may point to the disclaimer that it has recently added to its website, but the *Hatfield* case cited supra at p. 7, rejected the existence of a disclaimer as sufficient to offset the initial interest confusion caused by metataging by a third party with trademarks it does not own. 436 F.3d at 1240.

[9] Designer Skin will not extensively consider Defendants' citation to *The New Kids On The Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992) as this is clearly a first amendment newspaper case that has nothing at all to do with internet metataging. The citation of this case is thus wholly inapposite.

12

1  names "Playmate" and "Playboy" in a descriptive phrase referring to herself. [279
2  F.3d at pp. 800, 802, 803]  The *Welles* Court reasoned that for Tuesday Welles to
3  identify herself as "1981 Playmate of the Year" was not to infringe upon or dilute
4  the term "Playmate," but to refer to an award or prize freely bestowed upon her by
5  Playboy Enterprises.  See particularly 279 F.3d at 806.

6  Obviously, S&L's use of Designer Skin's name and product names in
7  metatags is not a use that refers to any award that has been received by S&L from
8  Designer Skin.  In fact, S&L has very explicitly and repeatedly stated that it does
9  not intend to convey the impression that it is or ever has been associated with
10 Designer Skin.  Hence, S&L's reliance on the *Welles* case is inappropriate.

11 Another difference between the *Welles* case and the present facts is that Ms.
12 Welles used the terms "Playmate" and "Playboy" in her metatags not in a stand
13 alone fashion, but as a part of a phrase or title.  279 F.3d at 803.  The *Welles* Court
14 found this significant, as a search on either of these terms would probably include
15 among its results the Welles webpage, but that webpage would typically not be at
16 the top of such results list or higher in the results list than the Playboy Enterprise
17 webpage.  279 F.3d at 804.  This is far different than the use of Designer Skin's
18 trademarked terms by S&L for the explicit purpose of diverting business from
19 Designer Skin's authorized salons.  There is simply no other motivation for S&L
20 paying the high costs of bidding on metatags comprised of trademarked names
21 (Sagarin Transcript pp. 104-105) other than to divert business to itself.

22 The facts and reasoning of the *Welles* case are far afield from the present
23 matter, since Welles' business differentiation and reputation was centered upon
24 her receipt of the "Playboy Bunny" designation.  Three other cases that are
25 progressively closer to the present facts and issue are the Ninth Circuit's later
26 opinion in *Playboy Enterprises, Inc. v. Netscape Communications Corporation*, 354 F.3d

1020 (9th Cir. 2004), the recently issued opinion of the United States District Court For The Eastern District of New York in S&L Vitamins, Inc. v. Australian Gold, Inc., 2007 WL 2932778 (EDNY)(slip opinion) and the Tenth Circuit's opinion in *Australian Gold, Inc. v. Hatfield*, 436 F/3d 1228 (10th Cir. 2006).

In *Netscape* the Ninth Circuit considered a situation where an internet search engine provider sold pop-up banner ad services to adult entertainment ("AE") providers. When a potential customer of AE services preformed a Netscape search engine search on any one of a list of AE related key terms "purchased" by a given AE provider from Netscape, the AE provider's banner ad would be displayed along with the search results list[10]  In reaching its holding, the Ninth Circuit distinguished sharply between generally descriptive key words concerning the product being sold by the AE businesses which Netscape was selling to and specific trademarked terms that also might be associated with the products of those AE businesses.  Hence, if the AE supplier's banner ad popped up whenever anyone searched on the term "sex," there would be no legal issue.  However, if the AE supplier's banner ad popped up whenever anyone searched on the trademarked terms "playboy" or "playmate" there would arise "initial interest confusion" as a matter of law.  The deliberate nature of the confusion arises from the AE supplier's purchase of trademarked terms owned by Playboy Enterprises as "key terms."  The Ninth Circuit observed that this diversion of business and appropriation of good will associated with Playboy Enterprises trademarked terms would be particularly likely if the banner ad were nonspecific as to the AE supplier sponsoring the ad and simply instructed the potential customer to "click here".  354 F.3d at 1025.

According to the *Netscape* Court, it *did not* make a difference that the potential customer might "immediately" recognize that the site he had been

---

[10] Also joined as a third-party defendant was one of owner of one of the adult entertainment websites to whom the internet search engine provider had sold certain of the keyword Designer Skin at issue.

directed to was not an official Playboy site when he clicked on a banner ad associated with searching on the trademarked term "Playboy." The damage would be done because the adult entertainment banner ad would have misappropriated the good will associated with Playboy Enterprise's trademarked term to draw business to a competitor's site. Id.

The *Netscape* decision thus recognizes that the sale and use of trademarked names in the internet search context by those who are not the trademark holders can constitute "initial interest confusion" (a legal association that S&L denies). It also highlights an important distinction as to nominative use, which S&L contends is the appropriate doctrine to apply to its use of Plaintiff's trademarked name and product names as metatags and key words:

> Defendants could use other words, besides PEI's marks, to trigger adult-oriented banner advertisements. Indeed, they already do so. The list they sell to advertisers includes over 400 terms besides PEI's marks. There is nothing indispensable, in this context, about PEI's marks. Defendants do not wish to identify PEI or its products when they key banner advertisements to PEI's marks. Rather, they wish to identify customers who are interested in adult-oriented entertainment so they can draw them to competitors' websites. **Accordingly, their use is not nominative.** (emphasis supplied.)

354 F.3d at 1030. The same should be said of S&L. S&L sells a variety of indoor tanning products produced by different manufacturers (Sagarin Deposition Transcript at pp. 59-60). If S&L limited its use of metatags and key words to "tanning lotions," or "indoor tanning" or "skin oils" or "rapid tanning" or "tanning oil supplier" (all general descriptive terms concerning the nature of S&L's actual business), there would be no legal issue. However, S&L, although acknowledging that it is not an authorized distributor of Designer Skin products and claiming it seeks no association with Designer Skin, has bid on and purchased the key word rights for "Designer Skin" and the key word rights for many of Designer Skin trademarked product names, and has added metatags for "Designer

Skin" and for these Designer Skin product names to its website. S&L is thus clearly seeking to engender initial interest confusion in the end users of Designer Skin products and appropriate the good well Designer Skin's trademarks for the purpose of diverting business to its website.

Squarely on point with the present facts is *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006). The summary statement of the Tenth Circuit regarding the possibility of initial interest confusion arising from third party use of trademarked metatags is the classical statement regarding the application of the "initial interest confusion" doctrine to the metatag context:

> The federal courts, although not using the phrase "initial interest confusion," have acknowledged the potential for such confusion for decades. See, e.g., *Grotrian, Helfferich, Schultz. Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975). Initial interest confusion in the internet context derives from the unauthorized use of trademarks to divert internet traffic, thereby capitalizing on a trademark holder's goodwill. See *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004)(holding that initial interest confusion occurs when a defendant uses a plaintiff's trademark in a way calculated to capture a consumer's attention and divert the consumer to the defendant's own Web site), cert. denied 544 U.S. 974, 125 S.Ct. 1825, 161 L.Ed.2d 723 (2005); *Brookfield Commc'ns, Inc. v. W. Cost Entm't Corp.*, 174 F.3d 1036, 1061-65 (9th Cir. 1999)(holding that the defendant's use of a trademark in a Web sites' metatags allowed the defendant to benefit improperly from the goodwill associated with the mark)…*Gov't Employees Ins. Co. v. Google, Inc.*, 330 F.Supp.2d 700, 701, 706 (E.D.Va.2004)(holding that the auction of trademarked terms to the highest bidder states a cause of action under the Lanham Act.

436 F.3d at 1239. Obviously, therefore, S&L's use of metatags and key words comprised solely of Designer Skin's trademarked name and trademarked product names infringes on Designer Skin's trademarks, results in initial interest confusion, and, hence, misappropriation of good will and unfair competition[11].

---

[11] See also, the discussions and holdings in *Victoria's Secret Stores v. Artco Equipment Co.*, 194 F.Supp.2d 704, 725 (S.D. Ohio 2002)("fair use" is not a permissible defense to trademark infringement when there is a likelihood of consumer confusion; incorporating tradename "Victoria Secret" in domain name, hyperlinks, metatags and texts of defendant's website is "bait and switch" intended to result in consumer confusion; *Horphag Research Ltd., v Pellegrini*, 337 F.3d 1036, 1041 (9th Cir. 2003)(use of trademark in meta-tags for defendants website satisfies the requirements for trademark infringement; nominate fair use doctrine is not

**MISCELLANEOUS RESPONSES**

The foregoing constitute the principal responses of Designer Skin to S&L's principal arguments. It is worth noting, however, that S&L has also raised arguments regarding dismissal of Designer Skin's claim for unfair competition and in support of its counterclaim.

S&L contents that there has been no showing of infringement upon Designer Skin's intellectual property rights. The foregoing, most of which is based on the Sagarin's own testimony in a related case, demonstrates that this contention is grossly false.

Similarly, it is clear that S&L's additional counterclaims for declaratory relief regarding noninfringement of Designer Skin's trademark and non-interference with Designer Skin's contractual relations with its distribution network are without basis. Summary judgment should thus be granted to Designer Skin with respect to all of S&L's counterclaims.

**V.   CONCLUSION**

For the reasons set forth above, Defendants' *Motion For Judgment* should be denied in its entirety.

DATED this 26th day of February, 2008.

                JENNINGS HAUG & CUNNINGHAM, LLP

                s/Elan S. Mizrahi
                Elan S. Mizrahi
                Craig J. Bolton
                Attorneys for Plaintiffs

---

an defense to infringement when defendant attempts to spawn consumer confusion, and defendant's meta-taging with cachet of trademark is attempt to spawn consumer confusion); *Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036, 1062-66 (9th Cir. 1999)(meta-taging with trademark of competitor results in "initial interest confusion" which is actionable under the Lanham Act ) citing and relying upon *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997) and *Grotrian Helfferich, Schulz Th. Stienweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341-422 (2d Cir. 1975); *Promatek Industries, Ltd. v. Equitrac Corporation*, 300 F.3d 808, 812  (7th Cir. 2002) (sustaining grant of temporary injunction partly on the basis that meta-taging with competitor's trademark results in "strong likelihood of consumer confusion); and *Eli Lilly & Co v. Natural Answers, Incorporated*, 233 F.3d 456, 465 (7th Cir. 2000)(meta-taging with competitor's trademark is "significant evidence of intent to confuse and mislead")

1 **CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2008, I electronically transmitted Plaintiffs'/Counterdefendants' Response to Motion for Judgment by Defendants/Counterclaimant to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Ronald D. Coleman, Esq.
Hoffman Polland & Furman PLLC
220 E. 42nd Street, Suite 435
New York, NY 10017
Attorneys for Defendant/Counterclaim Plaintiff
S & L Vitamins, Inc. and Defendant Larry Sagarin

s/T. Kido